**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, **Slip Opinion No. 2022-Ohio-1727.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-1727

LEAGUE OF WOMEN VOTERS OF OHIO ET AL. *v.* OHIO REDISTRICTING COMMISSION ET AL.

BENNETT ET AL. *v.* OHIO REDISTRICTING COMMISSION ET AL.

OHIO ORGANIZING COLLABORATIVE ET AL. *v.* OHIO REDISTRICTING COMMISSION ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, **Slip Opinion No. 2022-Ohio-1727.]**

*Redistricting—Original actions under Ohio Constitution, Article XI—The Ohio Redistricting Commission readopted a General Assembly–district plan that this court previously found to violate Article XI, Sections 6(A) and 6(B) of the Ohio Constitution—The readopted plan is invalid—The Ohio Redistricting Commission shall be reconstituted, convene, and draft and adopt an entirely new plan in conformity with the Ohio Constitution.*

(Nos. 2021-1193, 2021-1198, and 2021-1210—Submitted May 17, 2022—
Decided May 25, 2022.)

ORIGINAL ACTIONS filed pursuant to Ohio Constitution, Article XI, Section 9.

_____

**Per Curiam.**

{¶ 1} Respondent Ohio Redistricting Commission[1] adopted four General Assembly–district plans between September 2021 and March 2022. We invalidated each of those plans because they did not comply with Article XI, Sections 6(A) and 6(B) of the Ohio Constitution. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, ¶ 2 ("*League I*"); *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, ¶ 67-68 ("*League II*"); *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, ¶ 2 ("*League III*"); *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-1235, ___ N.E.3d ___, ¶ 2 ("*League IV*"). Each time, we ordered the commission to be reconstituted and to adopt a new plan in conformity with the Ohio Constitution. *League I* at ¶ 138; *League II* at ¶ 67; *League III* at ¶ 44; *League IV* at ¶ 78. In *League IV*, issued on April 14, 2022, we ordered the commission to adopt by May 6, 2022, an entirely new district plan that complies with the Ohio Constitution. *League IV* at ¶ 78-79.

{¶ 2} On April 20, a federal district court found that a group of Ohio voters had shown, at least at the preliminary-injunction phase, that Ohio's failure to implement new General Assembly districts in time for the May 3, 2022 primary election likely infringes on their right to vote. *Gonidakis v. LaRose*, S.D.Ohio No. 2:22-cv-0773, 2022 WL 1175617, *14-17 (Apr. 20, 2022). The federal court stated

_____

1. The commission is currently composed of Governor Mike DeWine, Secretary of State Frank LaRose, Auditor of State Keith Faber, Senator Robert McColley, Representative Jeffrey LaRe, Senator Vernon Sykes, and House Minority Leader Allison Russo. Each commission member is also a respondent in this matter. On May 11, 2022, Senator McColley and Representative LaRe notified the court that they had been appointed to the commission positions previously held by President of the Senate Matt Huffman and Speaker of the House Robert Cupp, respectively.

that if Ohio did not pass a new General Assembly–district plan that satisfies federal law by May 28, it would order the primary election for General Assembly races to be moved to August 2 and order Ohio to use, for the 2022 election cycle, the General Assembly–district plan the commission adopted on February 24, 2022— i.e., the plan we held to be unconstitutional in *League III*. *Gonidakis* at *2-3, 30; *see also League III* at ¶ 1-2. The federal court called that plan, and we now call it, "Map 3."

**{¶ 3}** On May 5, the commission readopted Map 3, purportedly only for use in the 2022 election. Petitioners[2] filed objections to the readoption of Map 3 the next day.

**{¶ 4}** The respondents who voted in favor of readopting Map 3 defend the commission's action, arguing that Map 3 is the only viable option for use in the 2022 election cycle. The fact remains that Map 3 still violates Article XI, Sections 6(A) and 6(B) of the Ohio Constitution. *See League III*. We ordered the commission to adopt "an entirely new General Assembly–district plan that meets the requirements of the Ohio Constitution." *League IV* at ¶ 78. Neither the current election deadlines, the General Assembly's inability or unwillingness to alter those deadlines, nor the question whether the map would be a viable option for use in the 2022 election cycle prevented the commission from adopting a new, constitutional district plan. The commission's duty to draft and adopt a constitutional district plan is distinct from considerations regarding the feasibility of implementing that plan for the 2022 election.

---

2. Petitioners in case No. 2021-1193 are the League of Women Voters of Ohio, the A. Philip Randolph Institute of Ohio, and six individual voters: Tom Harry, Tracy Beavers, Valerie Lee, Iris Meltzer, Sherry Rose, and Bonnie Bishop. Petitioners in case No. 2021-1198 are ten individual voters: Bria Bennett, Regina C. Adams, Kathleen M. Brinkman, Martha Clark, Susanne L. Dyke, Carrie Kubicki, Meryl Neiman, Holly Oyster, Constance Rubin, and Everett Totty. Petitioners in case No. 2021-1210 are the Ohio Organizing Collaborative, the Ohio chapter of the Council on American-Islamic Relations, the Ohio Environmental Council, and six individual voters: Pierrette Talley, Samuel Gresham Jr., Ahmad Aboukar, Mikayla Lee, Prentiss Haney, and Crystal Bryant.

{¶ 5} Therefore, in accord with our opinion in *League III*, petitioners' objections are sustained. The plan adopted by the commission on May 5 is invalid in its entirety, including for the reason that the commission purported to limit its effectiveness for only the 2022 election even though the Ohio Constitution provides that a map adopted by the commission will remain in effect for either four or ten years, depending on whether there was bipartisan support for the map, *see* Ohio Constitution, Article XI, Section 8(C)(1)(a) and 8(B). We order the commission to be reconstituted, to convene, and to draft and adopt an entirely new General Assembly–district plan that meets the requirements of the Ohio Constitution, including Article XI, Sections 6(A) and 6(B).

{¶ 6} We further order the commission to file the district plan with the secretary of state no later than 9:00 a.m. on June 3, 2022, and in this court by 12:00 p.m. on the same date. This court retains jurisdiction for the purpose of reviewing the new plan.

{¶ 7} Petitioners shall file objections, if any, to the new plan, by 12:00 p.m. on June 7, 2022. Respondents shall file responses, if any, by 12:00 p.m. on June 9, 2022. Petitioners shall not file a reply or any motion for leave to file a reply. The clerk of the court shall refuse to accept any filings under this paragraph that are untimely or prohibited.

{¶ 8} No requests or stipulations for extension of time for the objections or responses shall be filed, and the clerk shall refuse to file any requests or stipulations for extension of time. For good cause shown, the commission may file a motion for extension of time to file the district plan with the secretary of state.

{¶ 9} Petitioners' requests for additional relief are denied.

Objections sustained

and alternative or additional relief denied.

STEWART and BRUNNER, JJ., concur.

O'CONNOR, C.J., concurs, with an opinion joined by DONNELLY, J.

KENNEDY, J., dissents, with an opinion joined by DEWINE, J.

FISCHER, J., dissents, with an opinion.

———————————

**O'CONNOR, C.J., concurring.**

{¶ 10} This court has been placed in a remarkable position. With the reassurance provided by a federal district court in *Gonidakis v. LaRose*, S.D.Ohio No. 2:22-cv-0773, 2022 WL 1175617 (Apr. 20, 2022), that continuing delays and inaction would be rewarded with the implementation of a previously rejected map, respondent Ohio Redistricting Commission has, contrary to this court's clear order, resubmitted an unconstitutional General Assembly–district plan and, in doing so, has engaged in a stunning rebuke of the rule of law.

{¶ 11} In *Gonidakis*, the federal court thoughtfully recognized that if it were to act, it must do so only as a last resort. *Id.* at *4, *8, *10. Indeed, it stated: "We must provide the State as much time as possible to fix its own problems * * *. But at some point, the court must step in to provide a map if the State's officials fail to discharge their duties." *Id.* at *21. The federal court determined that to avoid jeopardizing Ohioans' right to vote, it would wait until May 28 before acting. *Id.* at *2. But the federal court did not "stay [its] hand until May 28," *id.*, as it stated it would, and leave the state to fix the crisis created by the commission's own actions, *id.* at *8. Instead, the federal court provided the Republican commission members not only a roadmap of how to avoid discharging their duties but also a green light to further delay these proceedings by stating its intention to implement "Map 3" (i.e., the plan this court held to be unconstitutional in *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, ¶ 2 ("*League III*")), all the while acknowledging that this court had declared Map 3 to be invalid and unconstitutional. *Id.* at *2.

{¶ 12} Consider for a moment how the federal court described its decision: "So the fact that Map 3 does not comply with the Ohio Supreme Court's

interpretation of state law does not prevent this court from imposing it—for one election cycle only—when faced with federal law violations, other state law concerns, and concerns about election administration on a short timeline." *Id.* at *27. Yet, each of the federal court's concerns was created by the commission's lack of action—which is in direct defiance of its constitutional duties and this court's *four* prior judgments—and all those concerns were then, and are now, fully capable of resolution by the commission or the General Assembly.

**{¶ 13}** Lamentably, the federal court's optimism that the commission members "are public servants who still view partisan advantage as subordinate to the rule of the law," *Gonidakis*, 2022 WL 1175617, at *25, fn. 19, proved to be unfounded. And its hope "that the Commission and the Ohio Supreme Court can set aside their differences and work together to find a solution," *id.* at *3, failed to recognize the commission's utter refusal to comply with this court's orders as rulings of law and the Republican commission members' *insistence* that they can act in derogation of the law and against their oaths to uphold it. The Republican dominance of the General Assembly gave rise to a telling boast by President of the Senate Matt Huffman: "We can kind of do what we want." Staver, *Who's Matt Huffman? The Lima man running the show at the Ohio Statehouse*, Columbus Dispatch (May 20, 2022), https://www.dispatch.com/story/news/2022/05/19/meet-matt-huffman-the-lima-republican-who-runs-ohio/7269099001/ (accessed May 20, 2022).[3] *Do what we want* apparently translates into the Republican-majority members of the redistricting commission ignoring rulings of this state's highest court and the mandates of Ohio's Constitution. Americans' belief that no one is above the law—no individual, no organization, no political party—is a bedrock of our nation's legal system, and one which makes it the envy of many other countries.

---

3. The article further notes that "with enough GOP votes to override the governor, [Huffman] can move election days, limit the powers of state officials and draw districts for 147 state and federal lawmakers." *Id.*

6

And it is because of that unassailable, foundational principle that it is entirely beside the point whether the majority party is Republican or Democrat. This concurrence would read the same if the Democratic party held the majority in the General Assembly and the majority on the commission, and their actions were the same as those of the Republican majority in this case.

{¶ 14} The federal court's statement that this court and the commission might "work together to find a solution," *Gonidakis* at *3, also erroneously suggests that this court actually has *a seat* at the commission's table. Indeed, if Article XI of the Ohio Constitution allowed for this court to have a seat at the commission's table, perhaps we would not be where we are today, and a constitutionally compliant map would be in place. But as we have recognized, this court's role in remedying the issue of an unconstitutional map is limited by Article XI, Section 9(D) of the Ohio Constitution, which provides:

> (1) No court shall order, in any circumstance, the implementation or enforcement of any general assembly district plan that has not been approved by the commission in the manner prescribed by this article.
> (2) No court shall order the commission to adopt a particular general assembly district plan or to draw a particular district.

{¶ 15} This court's recognition of its limits, however, does not lessen what it can do and what it has done within its constitutional authority: conclude that Map 3 does not comply with Article XI of the Ohio Constitution, which was overwhelmingly approved by Ohio's voters. *League III*, __ Ohio St.3d __, 2022-Ohio-789, __ N.E.3d __, at ¶ 2.

{¶ 16} As Chief Judge Marbley recognized in *Gonidakis*, "[t]hese rulings of the Ohio Supreme Court, pertaining to matters of state constitutional law, are

controlling." *Id*. at *33 (Marbley, C.J., concurring in part and dissenting from the remedy). The commission's refusal—*on four occasions*—to abide by this court's rulings has created a crisis that it has the ability to resolve. Yet, despite the federal-court majority's feigned interest in "buy[ing] Ohio more time to both make a new map and find ways to shorten the implementation of that map," *id.* at *25, it effectively instructed the Republican members of the commission that all they had to do to get their way was to wait out the clock until May 28—despite the valid order of this court ordering the commission to adopt an entirely new General Assembly–district plan that complies with the Ohio Constitution by May 6, *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-1235, ___ N.E.3d ___, ¶ 78-79 ("*League IV*").

{¶ 17} In light of this court's limited role in the redistricting process, setting aside differences and working together is the responsibility of the commission members in upholding their oaths of office as elected officials—oaths that are taken not to ensure that one political party has a supermajority but to obey Ohio's Constitution.[4] Setting aside differences and working together is surely also what

---

4. This fact has been recognized by the commission. As summarized in *Gonidakis*:

> In [*League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___ ("*League I*")], with election-related deadlines already looming, the Ohio Supreme Court ruled that "the election cycle should not proceed with a General Assembly—district map that we have declared invalid." [Id. at] ¶ 136. Following the decision in [*League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___ ("*League II*")], and the commencement of this litigation, Attorney General Yost wrote in a letter to the General Assembly: "The federal court may not order the use of a map that was rejected by the Ohio Supreme Court, where the underlying provision of the state constitution has not been found to violate the federal constitution." (ECF No. 91-4 at 2 (Yost Letter of Feb. 22, 2022)). In filings with this Court, Secretary [of State Frank] LaRose has written: "[A]s a statewide elected official who swore an oath to obey Ohio's Constitution, the Secretary cannot agree to Plaintiffs' motion and ask this court to order the use of a Redistricting Plan [referring there to the third plan] that a majority of the Supreme Court of Ohio has ruled violates Article XI of the Ohio Constitution."

Ohio's voters envisioned that *the commission members* would do in exercising their responsibilities as part of the commission.

{¶ 18} What was stated in a concurring opinion in *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___ ("*League I*"), has, for me, only been reaffirmed:

> Despite proponents' and voters' best intentions for systemic government change in approving the ballot measure to amend the state Constitution in 2015, the evidence shows that the leaders of the majority party in Ohio's veto-proof gerrymandered legislature managed to create a plan through the new bipartisan (as opposed to independent) redistricting commission that would have the effect of extending their party's dominance in even more impactful ways than in 2011—giving their party a supermajority of the legislature for another four years—just by adopting the plan by a simple majority of the commission vote without bipartisan support.  * * *
>
> The real takeaway from this four-year plan is that the Ohio Redistricting Commission should not be composed of people for whom the temptation may be too great to place political self-preservation above selfless service, regardless of party affiliation. What is needed in Ohio is an independent redistricting commission.

---

(ECF No. 113 at 8).  In his post-hearing brief, the Secretary made a similar acknowledgement with respect to the fourth plan.  Despite noting its practical benefits "from the point of view of ease of elections administration," the Secretary wrote: "If the Supreme Court were to rule [as now it has] that the Fourth Plan violates Art. XI, then the Secretary, as a statewide official who swore an Oath to obey Ohio's Constitution, should no longer advocate for the adoption of the Fourth Plan."  (ECF No. 164 at 7 & n.2).

(First three brackets added.)  *Gonidakis*, 2022 WL 1175617, at *33 (Marbley, C.J., concurring in part and dissenting from the remedy).

> Then, no matter who holds the pen, the district lines drawn will more likely be fair and reflect population changes of the state over ten-year swaths of time based on changes identified by the decennial United States Census.

*Id*. at ¶ 179-180 (Brunner, J., concurring).

{¶ 19} The latest actions by the commission make clear that without the federal court's April 20 opinion, there might have been a chance at getting Ohioans a fair map. The federal-court majority brushed off Chief Judge Marbley's supposition that the Republican members of the commission would "wait out the clock rather than work with the legislature and the Ohio Supreme Court to figure out a new map and, if necessary, a revised election timeline." *Gonidakis*, 2022 WL 1175617, at *25, fn. 19. But as Chief Judge Marbley predicted, they did just that. On April 14, this court ordered the commission to draft and adopt an entirely new General Assembly–district plan and file it with the secretary of state no later than 9:00 a.m. on May 6. *League IV*, __ Ohio St.3d __, 2022-Ohio-1235, __ N.E.3d __, at ¶ 78-79. On April 16, the two Democratic members of the commission—respondents Senator Vernon Sykes and House Minority Leader Allison Russo—began sending letters to the other commission members requesting that the commission reengage the independent map drawers and reconvene as soon as possible. Senator Sykes has stated that Speaker of the House Robert Cupp, who was then a cochair of the commission, notified him that the Republican commission members would not agree to meet until after the federal court issued its decision in *Gonidakis*. Later, after the federal court issued its decision, the Republican commission members reportedly told Senator Sykes that they would not agree to meet until after the May 3 primary election. The commission did not meet until May 4—20 days after this court's opinion in *League IV*, 14 days after release of the

federal court's decision, and *2 days before the commission's deadline to file a new General Assembly–district plan*.

{¶ 20} The Ohio Supreme Court and the Ohio Constitution should not be held hostage by a redistricting commission acting according to partisan directives and a legislature that has created a crisis due to its own inaction. Any threat to Ohioans' right to vote in this scenario stems entirely from the commission's repeated failures to comply with this court's rulings and the General Assembly's refusal to set a workable primary date. The remedy, then, should not be the approval of an unconstitutional map that rewards those who created the crisis to begin with. The remedy, instead, must be to craft a resolution of the manufactured crisis by those with the authority to do so—the commission and the legislature.

{¶ 21} Despite the deliberate intransigence of the supermajority party that has permeated these proceedings, I remind Ohioans that "the power rests at all times with the people," *Adams v. DeWine*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, ¶ 1. Those elected to office may be granted transitory authority to discharge their responsibilities under the Constitution and the laws of this state, but the citizens of Ohio retain the true power of self-governance. *Id*.

{¶ 22} Having witnessed the ways in which constitutional reforms may be frustrated by hyper-partisanship and the power of inertia, Ohioans have the power to change those dynamics. That opportunity must not be squandered.

DONNELLY, J., concurs in the foregoing opinion.

_____

**KENNEDY, J., dissenting.**

{¶ 23} We stand now in late May, looking back at a General Assembly–primary election that never was. From that result, it would be easy to say that the General Assembly–redistricting process instituted by Article XI of the Ohio Constitution just does not work and to blame respondent Ohio Redistricting Commission or individual members of the commission. But what happened in

these cases has little to do with the redistricting system that Ohioans voted for in 2015. This redistricting process was highjacked by a majority of this court—a majority that chose to ignore this court's constitutional role, unmoor itself from the plain language of the Ohio Constitution, and name itself the final arbiter of electoral fairness, including how Democratic-leaning a legislative seat must be to be chalked up as a Democratic win, even though that is not a requirement of Article XI.

{¶ 24} The majority here blames the commission. But Article XI includes an impasse procedure—a solution for when intransigent factions within the commission cannot agree on a bipartisan plan. *See* Ohio Constitution, Article XI, Section 8. There is a political price to pay in that instance—a plan that the commission passes by a partisan vote remains in effect for only two election cycles, not for five election cycles as district plans have historically stood. *See* Section 8(C)(1)(a).

{¶ 25} But there is no solution in Article XI for when a majority of this court expands the court's limited role and ignores the Constitution's plain language. The Constitution assigns this court the role of determining whether the objective line-drawing rules in Article XI, Sections 2, 3, 4, 5 and 7 have been followed. The majority, however, has assigned itself an all-powerful role as a super-commission with veto power over an adopted plan and the authority to rewrite the Ohio Constitution. The people of Ohio should be forgiven for not seeing that result coming—it is hard to see what is not there. Article XI does not contemplate this court's taking on the role that it has, and therefore, there is no procedure for when an errant court reaches an impasse with the commission. There is only impasse after impasse after impasse. That is where we are today.

{¶ 26} Article XI established an easy-to-understand process. It controls who draws a General Assembly–district plan, establishes subjective and objective map-drawing requirements, prescribes the length of time a district plan may last, and authorizes but limits judicial review of an adopted plan. For a more detailed

analysis of those provisions, see *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, ¶ 193-200 (Kennedy, J., dissenting).

{¶ 27} Article XI, Section 1 establishes the redistricting commission and provides the procedures that the commission must follow. The objective map-drawing requirements that the commission *shall* apply are contained in Sections 2, 3, 4, 5, and 7. Section 2 establishes the number of legislators per district. Section 3 sets forth the population and line-drawing rules for all districts and the composition and numbering of House of Representatives districts, and Section 4 prescribes the composition and numbering of Senate districts. Section 5 regulates district boundaries for senators who have unexpired terms, and Section 7 establishes the governmental-unit boundaries to be used.

{¶ 28} Section 6 contains subjective criteria that the commission "shall attempt" to apply. The requirements of Section 6 relating to an attempt to create proportional districts and districts that do not primarily favor a political party are examples of these subjective criteria.

{¶ 29} A General Assembly–district plan remains in place for ten years if it is adopted by a bipartisan vote that includes at least two members from each of the two largest political parties, unless it is invalidated by this court or a federal court. Article XI, Sections 1(B)(3), 3(A), and 8(B). Section 8 provides an impasse procedure: when the commission fails to adopt a plan by a bipartisan vote, it may adopt a plan that lasts only four years by a simple majority vote. In that situation, in the intervening four years before a new map is drawn, elections will occur, and the outcomes of the elections may change who sits on the redistricting commission.

{¶ 30} A district plan may be challenged in this court, but our authority to review the plan is limited. Section 9(D)(3) requires a predicate violation of the objective map- drawing requirements of Section 2, 3, 4, 5, or 7 before this court may invalidate a plan. The determination whether a plan is invalid or may be

amended by the commission depends on whether the violation or violations of Section 2, 3, 4, 5, or 7 are isolated, Section 9(D)(3)(a), more widespread, Section 9(D)(3)(b), or significant and material, Section 9(D)(3)(c).

{¶ 31} The entire General Assembly–redistricting process is displayed in the following flowchart:



{¶ 32} As in *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___ ("*League III*"), no party here argues that the district plan the commission adopted on February 24, 2022—i.e., the plan that the majority held to be unconstitutional in *League III* (hereinafter, "Map 3")—violates any of the objective map-drawing rules contained in Article XI, Section 2, 3, 4, 5, or 7, so this court has no authority to declare the plan unconstitutional. In *League III*, the majority read Article XI, Section 9 as allowing this court to consider whether the commission had violated Section 6, *League III* at ¶ 35—but nothing in Section 9 gives this court that authority. And the majority in that case found a supposed violation of Section 6 in declaring Map 3 unconstitutional. Today, the majority again declares that map unconstitutional, following its readoption. But the majority was wrong in *League III*, and it is wrong again today.

{¶ 33} The majority's role in this electoral chaos is based on its interpretation of the factors listed in Article XI, Section 6 as being mandatory. But Article XI creates a distinct difference between factors the commission *should consider* and factors the commission *must follow*. It makes that distinction clear in at least two ways. First, in regard to the factors in Section 6, the commission is told that it shall *attempt* to comply with those considerations. With respect to Sections 2, 3, 4, 5, and 7, the language contains no equivocation. For example:

- "Each house of representatives district *shall* be entitled to a single representative in each general assembly. Each senate district *shall* be entitled to a single senator in each general assembly." (Emphasis added.) Section 2.

- "Every general assembly district shall be composed of contiguous territory, and the boundary of each district *shall* be a single nonintersecting continuous line." (Emphasis added.) Section 3(B)(3).

- "Counties having less than one senate ratio of representation, but at least one house of representatives ratio of representation, *shall* be part of only one senate district." (Emphasis added.) Section 4(B)(2).

- "If more than one senator whose term will not so expire would represent the same district by following the provisions of this section, the plan *shall* designate which senator shall represent the district and *shall* designate which district the other senator or senators shall represent for the balance of their term or terms." (Emphasis added.) Section 5.

- "Notwithstanding the fact that boundaries of counties, municipal corporations, and townships within a district may be changed, district boundaries *shall* be created by using the boundaries of counties, municipal corporations, and townships as they exist at the time of the federal decennial census on which the redistricting is based, or, if unavailable, on such other basis as the general assembly has directed." (Emphasis added.) Section 7.

{¶ 34} The second way that Article XI distinguishes between what is mandatory and what is not is in the authority it gives this court. Section 9(D)(3) states that if this court "determines that a general assembly district plan adopted by the commission does not comply with the requirements of Section 2, 3, 4, 5, or 7 of [Article XI]," then certain remedies are available, including ordering the commission to adopt a new General Assembly–district plan. The fact that ordering full compliance with Section 6 is conspicuously absent from this court's constitutionally outlined authority cements the fact that the criteria of Section 6 are nonmandatory.

{¶ 35} Does the majority ever wonder how we got to this place of impasse? Does the majority wonder what part of the districting process passed by the people of Ohio in 2015 did not work the way it was designed? Did the people account for partisanship? Yes, they required bipartisanship in order to pass a ten-year plan. *See* Section 1(B)(3). Anything less than bipartisanship would yield a four-year

16

plan. *See* Section 8(C)(1)(a). Did they account for impasse among the commission members? Yes, they resolved it with the possibility of a four-year plan and instituted rules for when such a plan expires. *See* Section 8(C)(1)(b). Did the people account for controlling gerrymandering? Yes, they limited the number of times a political subdivision could be split, established rules requiring that districts consist of contiguous political subdivisions, and made the population in each district essentially equal. *See* Section 3. Did the people ensure that the line-drawing rules would be met? Yes, they gave this court authority to resolve disputes over whether the rules established to prevent gerrymandering were followed. *See* Section 9(D).

{¶ 36} And did the people give this court the power to overturn district plans for a standalone violation of Section 6's undefined and advisory criteria for compactness, proportionality, and limited partisan intent? No. That purported power, which the majority claims in reaching its decision, is not in the plain language of Article XI. The federal court reviewing these cases agrees that the majority's claim of that power is not rooted in the language of the Ohio Constitution: "[T]he Commission's maps were rejected under a strict proportionality test that cannot easily be found in the text of Ohio's Constitution." *Gonidakis v. LaRose*, S.D.Ohio No. 2:22-cv-0773, 2022 WL 1175617, *27 (Apr. 20, 2022). But the majority simply declares that the authority exists.

{¶ 37} Does the majority ever wonder whether its claim of that power is why the map-drawing process has broken down, i.e., whether its exercise of power that is not explicitly given to it but that it has claimed has led us to the place where we are? This court's power is limited to what is enumerated in the Ohio Constitution. That which is not enumerated is not a power that belongs to us. *See League III*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, at ¶ 136 (Kennedy and DeWine, JJ., dissenting).

{¶ 38} The people of Ohio need look no further than this court for the sole cause of the debacle of the missing primary. We had a limited role to review the objective map-drawing requirements set forth in Article XI, Sections 2, 3, 4, 5, and 7. The majority's purposeful misreading of Section 9 is the root cause of the issue. Only one entity in the redistricting process has failed to maintain its constitutionally defined place: this court. Instead of adhering to the words of the Constitution, the majority has unmoored itself from the Constitution to achieve a particular outcome. It is apparent in the words of the concurring opinion. The concurrence despises the supermajority of Republicans in the General Assembly and has sought to break it up through this series of cases. The redistricting process is always political. The people ratified Article XI and in doing so assigned this court a limited role in the process.

{¶ 39} The concurrence points fingers. It blames individual members of the commission and takes specific aim at respondent President of the Senate Matt Huffman, who was not even a member of the commission when Map 3 was readopted. He removed himself from the latest proceedings and appointed another senator in his place. Perhaps he appointed the other senator because he knew of the majority's contempt for him, as set forth in *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-1235, ___ N.E.3d ___, ¶ 12-27.

{¶ 40} The concurrence accuses the commission's majority of "a stunning rebuke of the rule of law." Concurring opinion, ¶ 10. But the majority in these cases is the body that rebuked the rule of law. The concurrence forgets that because of this extended redistricting process, for which it is responsible, this court is no longer the only court weighing in on Ohio's redistricting plan. Is it truly stunning that the commission would readopt a district plan that a federal court has already deemed worthy of establishing legislative districts?

{¶ 41} The concurrence reveals the actual motivation behind the majority's continuous invalidation of the commission's General Assembly–district plans, stating, "The Republican dominance of the General Assembly gave rise to a telling boast by President of the Senate Matt Huffman: 'We kind of do what we want.' " *Id.* at ¶ 13, quoting Staver, *Who's Matt Huffman? The Lima man running the show at the Ohio Statehouse*, The Columbus Dispatch, https://www.dispatch.com /story/news/2022/05/19/meet-matt-huffman-the-lima-republican-who-runs-ohio /7269099001/ (accessed May 23, 2022). So the concurrence must demonize Senate President Huffman, and the majority must demolish the Republican dominance of the General Assembly, so that the elected representatives of the people cannot control the legislation that is passed in this state. In my view, the concurrence urges Ohio's citizens to stop voting for Republicans and to go out and gather petition signatures calling for an independent redistricting commission.

{¶ 42} The majority concludes by setting another artificial, arbitrary deadline for a new district plan that it has no power to set while again retaining jurisdiction that it has no power to retain. By the time the majority opinion is released, the commission will have about eight days in which to create a new district plan. To what end? By that time, the primary election will be set and the districts divided according to Map 3. Any new plan passed by June 3 would not be used for a General Assembly election until 2024. A new plan passed during the pendency of a primary election could only sow confusion. Why limit the commission to an eight-day negotiation process? Can the majority not bear to be out of the limelight for much longer than that?

{¶ 43} Because no party claims that the district plan at issue violates the requirements of Article XI, Section 2, 3, 4, 5, or 7 of the Ohio Constitution, this court lacks any authority to declare it unconstitutional. I dissent.

DEWINE, J., concurs in the foregoing opinion.

_____

**FISCHER, J., dissenting.**

{¶ 44} I respectfully dissent.

{¶ 45} As I have explained previously, these cases are governed by the impasse procedures set forth in Article XI, Section 8 of the Ohio Constitution. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, ¶ 280 ("*League I*") (Fischer, J., dissenting); *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, ¶ 150-152 ("*League II*") (Fischer, J., dissenting); *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, ¶ 195 ("*League III*") (Fischer, J., dissenting); *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-1235, ___ N.E.3d ___, ¶ 109 ("*League IV*") (Fischer, J., dissenting). That issue is undisputed and forms the foundational basis for all three lawsuits, as each of the original complaints in these cases refers to that same provision. *League I* at ¶ 280.

{¶ 46} From the start of these cases, all allegedly brought under Section 8's impasse procedure, I have emphasized that the plain language of Article XI, Section 8(C)(1)(a) precludes this court from reviewing a four-year district plan adopted pursuant to the Section 8 impasse procedures. *League I* at ¶ 314 (Fischer, J., dissenting). Accordingly, this court has never had the constitutional authority to review the plans that have been presented throughout this litigation. In *League IV*, I stated that "it is this subversion of the wording of Article XI that is the reason the majority opinion today continues to create more and more problems for Ohio." *Id.* at ¶ 110 (Fischer, J., dissenting). Today's majority opinion only exacerbates those problems.

{¶ 47} Today's majority opinion acknowledges the escalating problems facing this state, all resulting from the majority opinion's flawed constitutional interpretation. *See* majority opinion, ¶ 2. As the majority opinion notes, the latest

wrinkle in these cases is that respondent Ohio Redistricting Commission has purported to limit the effectiveness of the newest plan to only the 2022 election, which, as the majority opinion correctly recognizes, the commission has no authority to do. *Id.* at ¶ 5; *see also* Article XI of the Ohio Constitution.

{¶ 48} But this is only one problem among many. Most significantly, a federal court has now stepped into this court's self-created redistricting mess, and Ohioans will in all likelihood be voting for state representatives in a special election imposed on this state by a panel of federal judges. As I have stated before, I wish this were not the case. *League IV* at ¶ 114 (Fischer, J., dissenting). By not following the text of Article XI, Section 8, the majority opinions in these cases have effectively handed Ohio's authority over its own elections to a federal three-judge panel—a panel that Ohioans did not select. This development is contrary to the will of Ohioans who, in enacting Article XI, mandated that redistricting be conducted by a commission comprised of Ohio's elected officials who are directly accountable to the people of Ohio. These, and many other problems, have been created and continue as a result of the majority opinions' continuing disregard for the text of the Ohio Constitution.

{¶ 49} Today's majority opinion continues the pattern of first reviewing a General Assembly–district plan without the constitutional authority to do so and then, also without the constitutional authority to do so, ordering the commission to act in a certain way and on a specific schedule. Today's majority opinion does not cite any authority to support its various orders to the commission. Starting with *League I*, this court has retained jurisdiction over these cases through its majority opinions, which have ordered the commission to act in certain ways and within certain specified time frames, without relying on any Ohio constitutional authority under which this court may issue such orders. *See League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 139; *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 68; *League III*, ___ Ohio St.3d ___, 2022-Ohio-

789, ___ N.E.3d ___, at ¶ 44-45; *League IV*, ___ Ohio St.3d ___, 2022-Ohio-1235, ___ N.E.3d ___, at ¶ 78-79. This is because there is no such authority to do so under Article XI of the Ohio Constitution.

{¶ 50} Under Article XI, Section 9, this court's authority is limited to, at most, "order[ing] the commission to adopt a new general assembly district plan in accordance with [Article XI]." Article XI, Section 9(D)(3)(b) and (c). This court is not authorized to order the commission to adopt any particular plan. Article XI, Section 9(D)(2). The majority opinions in *League II*, *League III*, *League IV*, and herein have ordered an "entirely new" plan. *League II* at ¶ 67; *League III* at ¶ 44; *League IV* at ¶ 78; majority opinion at ¶ 5. This court has no constitutional authority to order an "entirely" new plan, just a "new" plan.

{¶ 51} Moreover, the commission's task is a legislative one, as acknowledged by the majority opinion in *League I*. *Id.* at ¶ 76. It is fundamental that, in order to preserve the integrity of the legislative function, this court must refuse to interfere in the legislature's—or any similar legislative body's—exercise of the legislative prerogative. *See Cent. Ohio Transit Auth. v. Transport Workers Union of Am., Local 208*, 37 Ohio St.3d 56, 62, 524 N.E.2d 151 (1988). Thus, not only does this court lack authority under Article XI, Section 8 to review any four-year plan the commission submits, but it also lacks authority to do anything other than order the commission to convene and adopt a plan that complies with the Constitution. Article XI, Section 9. In summary, the majority opinions include orders that they have no constitutional authority to make and set specific time frames without constitutional authorization, and they do so in derogation of longstanding Ohio Supreme Court decisions declaring that this court stay out of legislating. *See, e.g.*, *Cent. Ohio Transit Auth.* at 62.

{¶ 52} As one judge summarized in the federal decision related to this case, "As Plaintiffs have maintained from the start, the perpetual turmoil and uncertainty during this redistricting cycle has harmed candidates, election officials, and the

Ohio polity." *Gonidakis v. LaRose*, ___ F.Supp.3d ___, ___, 2022 WL 1175617, *40 (S.D.Ohio 2022) (Marbley, J., concurring in part and dissenting from the remedy). By violating the plain terms of Article XI, Section 8, and by compounding this violation through the further, improper exercise of extraconstitutional authority, the majority opinions have created this perpetual turmoil and uncertainty in Ohio's elections for members of the General Assembly and other public offices. These majority opinions are an embarrassment, a "scar" on Ohio's constitutional history, and they have created statewide-election chaos.

{¶ 53} For these reasons, I continue to have deeply significant concerns about the approach followed in the majority opinions in these cases. I respectfully dissent and would overrule the objections.

_____

ACLU of Ohio Foundation, Inc., Freda J. Levenson, and David J. Carey; American Civil Liberties Union, Alora Thomas, and Julie A. Ebenstein; and Covington & Burling, L.L.P., Robert D. Fram, Donald Brown, Joshua González, David Denuyl, Alexander Thomson, Anupam Sharma, and Yale Fu, for petitioners in case No. 2021-1193.

McTigue, Colombo & Clinger, L.L.C., Donald J. McTigue, and Derek S. Clinger; and Elias Law Group, L.L.P., Abha Khanna, Ben Stafford, Jyoti Jasrasaria, Spencer W. Klein, Harleen K. Gambhir, and Raisa M. Cramer, for petitioners in case No. 2021-1198.

Reed Smith, L.L.P., Peter M. Ellis, M. Patrick Yingling, Brian A. Sutherland, Ben R. Fliegel, Brad A. Funari, and Danielle L. Stewart; and Brennan Center for Justice at New York University School of Law, Alicia L. Bannon, Yurij Rudensky, and Harry Black, for petitioners in case No. 2021-1210.

Dave Yost, Attorney General, and Organ Law, L.L.P., Erik J. Clark, and Ashley T. Merino, special counsel to Attorney General Dave Yost, for respondent Ohio Redistricting Commission.

Dave Yost, Attorney General, and Zeiger, Tigges & Little, L.L.P., John W. Zeiger, Marion H. Little Jr., and Christopher J. Hogan, special counsel to Attorney General Dave Yost, for respondent Ohio Governor Mike DeWine.

Dave Yost, Attorney General, Jonathan Blanton, Deputy Attorney General, Michael J. Hendershot, Deputy Solicitor, and Julie M. Pfeiffer and Michael A. Walton, Assistant Attorneys General, for respondent Ohio Secretary of State Frank LaRose.

Taft, Stettinius & Hollister, L.L.P., W. Stuart Dornette, Beth A. Bryan, and Philip D. Williamson; and Nelson, Mullins, Riley & Scarborough, L.L.P., Phillip J. Strach, Thomas A. Farr, John E. Branch III, and Alyssa M. Riggins, for respondents Senator Robert McColley and Representative Jeffrey LaRe.

Cooper & Elliott, L.L.C., C. Benjamin Cooper, Charles H. Cooper Jr., and Chelsea C. Weaver, for respondents Senator Vernon Sykes and House Minority Leader Allison Russo.

Mark G. Kafantaris; and Center for Competitive Democracy and Oliver Hall, in support of petitioners' objections for amici curiae Center for Competitive Democracy, Professor Ruth Colker, and Professor Mark Brown.

Belinda Spinosi, pro se, in support of petitioners' objections as amicus curiae, in case No. 2021-1193.

_____